NANCY GOODWYN, plaintiff in error, vs. NAPOLEON B GOOD-
WYN, defendant in error.

A verdict is not unsupported by the evidence, where the evidence against the
verdict is conflicting in itself, and where there is evidence in favor of it, con-
sisting of the sayings of the person against whom it is rendered.

Trover, in Coweta Superior Court. Tried before Judge
RICE, March Term, 1859.

This was an action of trover, by Napoleon B. Goodwyn
against Nancy Goodwyn, to recover certain slaves, alleged to
be in her possession belonging to plaintiff, who was her son

At the trial, the plaintiff offered in evidence the following
testimony, to-wit:

*William Baily*, who proved the number and value of the
negroes in controversy, and that defendant had been in pos-
session of them ever since he knew them.

*William Beadles* testified, that he knew Winey; she was
about forty years old; not much acquainted with her; in
1846, in the latter part of the year, or in the first part of the
year 1847, defendant was at the house of witness, and got
into conversation about her daughter who was going to be
married. I said to her, I suppose a certain lady has given
Napoleon his walking papers; when defendant said, they
need not do it, nor any other lady, for Napoleon had as much
property as her father was able to give her; that Napoleon
had some four or five negroes, and went on to mention Wi-
ney, Harriet and Caroline, and said that his grand-mother had
willed them to him in Virginia. The negroes were in de-
fendant's possession the first he knew of them, and were in
her possession at the time of the conversation; witness has
seen said negroes at her house, and at his own house. Wit-
ness knew only three of the negroes at the time alluded to,
viz: Winey, Caroline and Harriet. Defendant said one got
burnt and died in Virginia, that belonged to plaintiff; defend-

ant said that the negroes belonged to plaintiff; that his grand-mother had willed them to him, and that the will was proven and recorded.

*Thomas G. King* testified as follows: That he was at defendant's in 1845 or 1846, thinks it was in 1845, in October; was building a screw for defendant; conversed with defendant about a couple of yellow girls then in her possession; does not know their names. Spoke with defendant about Mrs. Simms, her daughter, who was sick; witness asked her why she did not send one of the yellow girls to wait on her daughter, Mrs. Simms; she replied they belonged to her son up the country, and that he was coming after them that fall. The yellow girls were nearly grown and very likely. Saw another negro woman about thirty or thirty-five years old. Mr. Simms had a cook and a little girl that stayed at the house, and another woman and some fellows who worked in his plantation.

*James H. Graham* testified as follows, viz: That King built a screw for William Beadles in 1845, and witness has always thought he built defendant's screw the same year; thinks he went from Beadles's to defendant's; thinks Beadles's screw was built in August or September; cotton was open; hands were picking cotton; thinks King stayed at Beadles's ten days or two weeks, perhaps more.

Plaintiff next introduced a copy of the will of *Mrs. Elizabeth Goodwyn*, the grand-mother of plaintiff, by which will the said Elizabeth Goodwyn bequeathed to him Winey and her children, subject to a trust deed on the children, under and by virtue of which said will, plaintiff claimed title to the property in dispute; which will bears date on the first day of October, 1830.

Plaintiff next introduced the testimony of *John R. Cross* taken by commission, which was as follows: Witness knows the parties; knows Winey, Caroline, Harriet, Julia and Ned does not know Martha and Antony; first knew them in Virginia at the house of Mrs. Nancy Goodwyn, in 1842, and has

known them from then until now, 1854. They were in Nancy Goodwyn's possession when he first saw them. Witness says that Nancy Goodwyn always said, until suit was commenced, that said negroes were the negroes of Napoleon B. Goodwyn. Witness has heard Nancy Goodwyn say, both in Virginia and Georgia, that said negroes were Napoleon's, and he heard her say this in 1842, 1843 and 1845. Said slaves were in defendant's possession at those times; he has lived in defendant's family; it was in 1842 and 1843. Defendant lived in Virginia, Brunswick county, and moved to Georgia in 1843. Thomas D. Goodwyn, Napoleon B. Goodwyn, Braddock Goodwyn, James Goodwyn, Henry Goodwyn, Louisa Goodwyn, Ann Eliza Goodwyn, Sarah Goodwyn, John D. Perkins, and witness, came with her to Georgia. There came with her also, fifteen or sixteen negroes that witness knew, to-wit: Bristol, Bill, King, Hamlin, Stephen, Rose, Mary Jane, Anny, Phebe, Charlotte, Winey, Caroline, Harriet, Ned and Julia. Witness was present when a proposition was made to buy Caroline, on the road from Virginia to Georgia, some where in North Carolina. Said proposition was made to Mr. Thomas D. Goodwyn, and he, in his mother's presence, (Mrs. Nancy Goodwyn,) referred the man wishing to purchase, to Napoleon B. Goodwyn, telling him that the negroes belonged to Napoleon. The purchaser then applied to Napoleon, and he told him that money could not buy her. Nancy Goodwyn, at the above mentioned place, made no reply, nor did she say any thing. Witness did not know the man who made the proposition referred to. Witness resided from 1839 to 1843 in Virginia. Witness always understood, and heard the defendant and family say, that the before specified negroes were Napoleon's; never heard defendant dispute his title to said negroes, while in her family, nor any other one of the family.

To cross interrogatories witness answers: He knew all the negroes except Martha, Antony and Joe; knew them in Virginia and Georgia; has known them ever since 1842; they

were in Nancy Goodwyn's possession when he first knew them, and in her possession when he last knew them. Defendant said that the slaves were Napoleon's at various times; does not recollect the days when he heard defendant say that the slaves were Napoleon's, but it was in the years 1842, 1843 and 1844. Has lived in the defendant's family; she did not control said negroes as she thought proper, but as Napoleon's negroes only. Does not know that plaintiff acquiesced, but he knew that she exercised control as above stated. Does not recollect that he ever heard plaintiff speak of hiring out said negroes and defendant objecting; never stated in his evidence in a former trial, that the last time he heard defendant say the negroes belonged to Napoleon B. Goodwyn, was in 1843. He never made use of any such expression at John W. Powell's nor at any other place.

Plaintiff next introduced the testimony of *Joseph B. Camp*, taken by commission, which was as follows: That he did sign the annexed instrument as a witness, and saw a copy of the same served upon defendant by plaintiff, on the evening of the 13th day of August, 1849, at defendant's own house in Coweta county, Georgia, and defendant refused to give them up, saying that they were not plaintiff's negroes. Plaintiff demanded the negroes of defendant at her own house in Coweta county, Georgia, and she refused to give them up. Witness further states that plaintiff charged defendant with having told him heretofore, that they were his negroes, saying to her at the same time: "Ma, do you not know you told me last fall they were my negroes? did you not tell me so?" To which defendant said nothing—placing, at the same time, her hands over her face, as if at a great loss to know what to say—when Thomas and Braddock Goodwyn spoke simultaneously, in a loud and angry manner, saying and repeating often; "No, she never; they are not your negroes; you shall never have them." And this produced quite an excitement, and at one time witness thought the parties would come to blows, but they did not.

Then follows a copy of the instrument attached to the interrogatories exhibited to said Camp, containing a demand for the negroes.

Plaintiff next introduced *Jack C. Lumpkin,* who testified as follows : That he knew Ned ; worth twelve hundred dollars ; about twenty years old, and worth for hire the last ten years, on an average of seventy-five dollars per annum. Witness saw Ned in Napoleon's possession ; plaintiff got Ned from his mother ; thinks he remained in plaintiff's possession about one year in Newnan, about his grocery ; does not know where Ned went to when he left plaintiff's possession; has never seen Ned since.

Plaintiff next introduced the testimony of *Elizabeth H. Edmondson,* taken by commission. She says she knew the parties ; she was acquainted with the slaves Winey and Caroline, and a girl by the name of Harriet, who she understood was the child of Winey, and that she did not recollect to have seen any other children of Winey and Harriet. She says she heard Nancy Goodwyn say, that there were five negroes left to Napoleon by his grand-mother ; these five negroes were Winey and her children. She is not positive, but thinks its was five negroes stated at the time by Nancy Goodwyn, as being the number, including Winey and her children. She states that it was about the first of September, in the year 1843, at the house of Mrs. Nancy Goodwyn, in the county of Coweta, when the conversation was had. She states that the said negroes were then at the house of Mrs. Nancy Goodwyn, and she presumed they were in her possession at the time ; that she heard Mrs. Nancy Goodwyn say several times previous to the first of September, 1843, that said negroes, Winey and her children, were Napoleon B. Goodwyn's negroes. She states that she knew Caroline and Harriet ; that they are mulatto girls ; Caroline rather tall and Harriet of medium size ; that she had seen Winey ; that she is of dark complexion ; that she does not recollect her size. The other children she knows nothing of. That the conversation was

had with Mrs. Nancy Goodwyn in the month of September, 1843, at one time, and that she had heard her make about the same statement several times previous to the first of September, 1843, at the house of defendant; that no person was present besides witness at the time and place of conversation. That Napoleon B. Goodwyn had said that he would give all that he was worth or ever expected to be worth, for a certain gentleman to leave his wife, and then stated to witness the conversation referred to.

Plaintiff next introduced the testimony of *William Mitchell*, taken by commission. He says he knows the parties; that he resided on defendant's plantation, and overseed the slaves mentioned in the interrogatories, which were born in Virginia; that he has never heard defendant say any thing in relation to the ownership of said slaves; witness heard her say, in 1840, when the plaintiff proposed to hire out one of the slaves, that she could give as much for her as Mr. Foster, who proposed to hire her. The slaves were in possession of defendant; plaintiff lived with defendant till they moved to Georgia; plaintiff lived with his father until his death; he died in Brunswick county, Virginia, the place from whence his widow moved to Georgia. Don't know when the plaintiff's grand-mother, Elizabeth Goodwyn, died, or who died first. That he had loaned defendant money.

Plaintiff then introduced the testimony of *John D. Perkins*, taken by commission, which was as follows: Witness knew six of the negroes; knew them last in the possession of defendant in the State of Georgia; he never heard defendant say any thing about the ownership of said negroes; he resided with defendant while in Georgia as a visitor; left 15th November, 1845; knew nothing about the way in which the negroes came into the possession of defendant; plaintiff lived with his father until his death, and then resided with the defendant until she removed to Georgia; plaintiff lived with defendant about ten or twelve months after she removed

to Georgia; witness returned to Virginia on the defendant's business.

Plaintiff next introduced the testimony of *William H. Goodwyn* and *Stephen P. Pool,* taken by commission: William H. Goodwyn knew Winey as the slave of Burwell Goodwyn; knew she had children; does not recollect their number or sex; recollects nothing about the sale of said slaves.

*Stephen P. Pool* knows Winey and two of her children, Caroline and Harriet; Winey had other children, but he does not recollect their number or names. They were the property of Burwell Goodwin. Mrs. Elizabeth Goodwyn purchased Winey and all her children, except one, a boy, who was bought by Nathaniel Pegram, of Dinwooddie county, Virginia. Both witnesses say they are acquainted with all the parties named. William H. Goodwyn has read or heard read the original will alluded to, but it has been so long ago, that he does not recollect the contents of said will. He saw the original executed, and signed it as a witness; the original will was either written by Burwell Goodwyn, or Joseph Goodwyn, the executor, he does not recollect which— both being present when it was written. Both witnesses say they do not know where Napoleon B. Goodwyn lived during the whole time prior to the removal of his mother to Georgia; they think he resided a part of his time with his mother probably a greater part of his time with his mother; they think he was residing with his father at the time the will was executed, and in fact up to his father's death. Witnesses do not know the plaintiff's age at the time referred to. Stephen P. Pool knew he was living with his father at the time of the sale referred to. He never heard Burwell or Nancy Goodwyn say anything about the ownership of the slaves. Witnesses knew the late Col. Joseph Goodwyn died in June, 1838. He acted as executor of the will referred to. They believe the slaves were all the time in the possession of Burwell Goodwyn and his widow, up to the time of her removal to Georgia. They do not know whether or not it was with the assent of Col.

Goodwyn that the slaves remained in the possession of Burwell Goodwyn to the time referred to, nor do they know any thing about his consenting to any legacy.

*Answers to Cross-Interrogatories: Stephen P. Pool* said, he knew nothing to prove it a sham sale; was present at the sale and knew it was not a sham sale. It has been a long time since the sale; that he cannot now recollect whether he saw any money paid by purchasers or not. He never heard Burwell Goodwyn, Mrs. Nancy Goodwyn, or any of the parties, except Mrs. Elizabeth Goodwyn, in the matter specially mentioned, say anything about said slaves after the sale. Both witnesses say, as far as they know, possession was never interrupted by the executor. They do not recollect that they ever heard him say any thing on the subject.

Plaintiff next introduced the testimony of *Abram V. Wells* and *Exavia Foster*, taken by commission, which was as follows: Abram V. Wells knows all the parties, and was well acquainted with Burwell Goodwyn, the person referred to in said interrogatories. He knew the woman Winey, referred to, knew she had children, had seen them often, but did not know them by name. Remembers having heard the said Burwell Goodwyn and Nancy Goodwyn, all since the year 1830, say that the slaves referred to, had been purchased by Mrs. Betsy Goodwyn, and by her given to Napoleon B. Goodwyn. Witness Wells further states, that he heard each of them boast how well Napoleon would be off. He does not remember having heard Burwell Goodwyn speak of his right of possession. He heard Mrs. Nancy Goodwyn say, since the death of her husband, that the said slaves belonged to Napoleon, but he does not recollect the time when he last heard her say so, but is satisfied it was since the death of her husband. Witness further states that after said sale above mentioned, Burwell Goodwyn was considered insolvent; that he knew he was largely indebted, and if he had claimed the property, his creditors would have levied

on it; that he did some business for the said Goodwyn, and knew that such was the fact.

*Answers to Cross-Interrogatories:* Witness knows that Winey was the name of the woman formerly owned by Burwell Goodwyn; that he never heard Burwell Goodwyn say he held them under his mother for the benefit of his children; but that he heard Burwell Goodwyn say the said negroes belonged to Napoleon. That he cannot recollect when he last heard Burwell Goodwyn speak of it; but he heard him speak of it since the said sale; that he never heard Mrs. Goodwyn say that said negroes were paid for by her husband's money, or that they belonged to her children, but that she always said that said negroes belonged to Napoleon; that he cannot recollect the last time that he heard Mrs. Goodwyn speak of the matter; that she (Mrs. Goodwyn) was in the habit of visiting his house, and that he there heard her often speak of the said negroes.

*Exavia Foster,* answers as follows: He knows the parties in said cause, and was intimate in the family, but that he did not know Burwell Goodwyn; he died before he moved to Brunswick; he knew the woman Winey and her children, Caroline and Harriet; that she might have had other children; that he did not recollect them; that he never saw Burwell Goodwyn; that he heard Mrs. Nancy Goodwyn frequently say since her husband's death, that the said Winey and her children belonged to Napoleon, that they were purchased by his grand-mother and given to him. He cannot say the exact time when he last heard her speak of the matter, but that he is satisfied he heard her say as much a short time before she left Virginia. That he did at one time make application to Napoleon to hire Caroline, but that he is not distinct in his recollection as to the circumstances; he thinks he first applied to Napoleon, and he referred him to his (Napoleon's) mother, and when he consulted her, she told him to see Napoleon, saying the negroes belonged to Napoleon. The conversation took place at Mrs. Goodwyn's. He could

not recollect the precise time, nor could he say whether Napoleon was present when he spoke to his mother.

*Answers to Cross-Interrogatories:* That he does not know they are the same negroes, but that Winey, Caroline and Harriet were the names of three negroes in Mrs. Goodwyn's possession, claimed by Napoleon ; he repeats, he never saw Burwell Goodwyn, he never heard Mrs. Goodwyn say the negroes were purchased with her husband's money, but she always said the negroes were Napoleon's; that he could not say the last time he heard Mrs. Goodwyn speak of said negroes, that he heard her speak of them repeatedly in her own house and in presence of all the family. That Mrs. Goodwyn visited his, witness's, house, very often, and that he has head her there say the negroes belonged to Napoleon. The witness cannot recollect who was present when he spoke to Mrs. Goodwyn about hiring the girl Caroline, or whether any one; that the conversation occurred at Mrs. Goodwyn's house.

Plaintiff next introduced the testimony of *Wm. H. Goodwyn* and *Stephen P. Pool,* taken by commission. Pool answers, I never have examined the original will of Elizabeth Goodwyn, deceased; I am acquainted with the hand writing of Burwell Goodwyn, deceased; I have seen him write divers times; I have seen writing that he acknowledged to be his; I have not examined the will as before stated; I never heard Burwell Goodwyn say he wrote the will; I know the negroes Winey and Caroline, and they were bought by Elizabeth Goodwyn ; I do not know who carried them to Georgia ; I do not know who took them away from Virginia; they were in the possession of Nancy Goodwyn after the death of Burwell Goodwyn ; I never heard Burwell Goodwyn nor his wife say anything in regard to the ownership of said slaves, Winey and Caroline.

*Answers to Cross-Interrogatories: Pool* answers, I was not present at the writing of the will, and know nothing of any conversation that took place; I do not know for what

purpose they were willed to said Napoleon, I know nothing of an agreement to shield them from said Burwell Goodwyn's debts; I never did hear said Elizabeth say or Burwell Goodwyn, in her presence, uncontradicted by her, that such an arrangement was made; I know nothing about the deed of trust, its place of deposite or what has become of it, for whose benefit, or that there ever was one made; I know but little of Winey and children; after I had them sold, never saw them but once afterwards. Wm. H. Goodwyn answers, that he never examined the original will of Elizabeth Goodwyn though he witnessed it; he is not acquainted with the hand writing of Burwell Goodwyn; has seen him write, saw him write the last will of Elizabeth Goodwyn, to which he was a witness; never heard Burwell Goodwyn make any allusion to the will of Elizabeth Goodwyn; knows the slave Winey alluded to; does not know who carried her to Georgia; does not know whose possession they were in, in Virginia after the death of Burwell Goodwyn.

*Answers to Cross-Interrogatories:* Witness was present when Elizabeth Goodwyn made her will; he was quite young at the time; does not recollect the conversation that passed between Burwell Goodwyn and Elizabeth Goodwyn on the occasion, and did not know, at the time, any of its contents; he does not know for what purpose or why Winey and her children were willed to Napoleon B. Goodwyn; has never heard, as well as his memory serves him, Elizabeth Goodwyn say any thing in respect to the matter; he knows nothing in relation to the deed of trust or what has become of it; he does not know that the said deed of trust was made for Burwell Goodwyn and his children's benefit; he does not positively know the said negroes remained in Burwell Goodwyn's possession after said Sheriff sale, but thinks they did; does not know how long said negroes were in possession of Burwell Goodwyn, if at all; is not positive but thinks said slaves, Winey and her children, were in the possession of Burwell Goodwyn at the time Elizabeth Goodwyn made her

will; does not know positively that said slaves remained in said Burwell Goodwyn's possession up to the time of his death, but supposes that they did; he never heard defendant claim said negroes; cannot answer anything of his own knowledge in reference to the possession of said negroes by Burwell Goodwyn or Nancy Goodwyn after the Sheriff sale; has never heard Elizabeth Goodwyn say anything in reference to Winey and her children being given to said Napoleon for the purpose of securing them from debts of said Burwell Goodwyn; never heard Elizabeth Goodwyn mention a trust deed or anything relating to it; recollects nothing of the deed of trust; never heard Elizabeth Goodwyn say she bought Winey and her children at Sheriff sale and paid for them with Burwell Goodwyn's money.

Plaintiff next introduced the testimony of *Nathaniel J. Pegram*, taken by commission; witness answers as follows: I knew Napoleon B. Goodwyn when a little boy, also his mother, Mrs. Burwell Goodwyn, but do not recollect her given name; he is the grandson of Mrs. Elizabeth Goodwyn; was present at the sale referred to; a number of negroes were sold, among them, if I remember rightly, a negro woman named Winey and her children; how many cannot state; the prices the negroes sold for do not recollect; I bought one of the negroes, a very small boy, named John; if I had any other connection with the sale, do not recollect it; cannot state that Elizabeth Goodwyn did, in person or through an agent, pay for the negroes bought at the sale; he answers, my answer to this question is embodied in my answer to the third question; he answers, I cannot state that the property was sold by the Sheriff, but such is my recollection; cannot state who the Sheriff of Brunswick county was at the time the sale took place in Brunswick county, Virginia; cannot state that Mrs. Elizabeth Goodwyn was at the sale; he saw Skepeth M. Oliver there at the sale; does not know that he bid for or bought any of the negroes; Oliver resided in Dinwooddie county, Virginia; witness and Burwell Goodwyn

were not, at the time of the sale, nor previously, on terms of intimacy.

The plaintiff having closed his case, the defendant offered in evidence the following testimony, to-wit:

A copy, duly certified under the act of Congress, of the record of a judgment and an execution issued thereon, obtained on the 6th day of April, 1829, in the Superior Court of law, for the county of Dinwooddie, State of Virginia, in favor of Etheriel Crowder, assignee of Stephen P. Pool, against Burwell Goodwyn and Stephen P. Pool, which execution showed a seizure and sale of Winey and Caroline, two of the negroes in dispute, and the ones from which all the rest of the negroes in dispute descended, by Wm. M. Gill, Deputy Sheriff of Brunswick county, State of Virginia, and the purchase of said negroes, Winey and Caroline, at said sale, by Skepeth M. Oliver, at the price of three hundred dollars.

*William M. Gill's Interrogatories :* Knows the parties. John Tucker was Sheriff of Brunswick county, Virginia, in the years 1828 and 1829, and to March 1830, the deputies of said Tucker, during said period, were Charles Trumbull, Wm. J. Buford, Thos. M. Buford, Edward B. Tucker and witness. Witness further states, that he knew of the sale of Winey and her child Caroline, sold as the property of Burwell Goodwyn in the year 1829. Witness levied the execution and made return and sale, to the best of his recollection; said sale was made under a writ of *fieri facias* from the Clerk's office of the Superior Court of law, for the county of Dinwooddie, State of Virginia, in the case of Etheriel Crowder, assignee of Stephen P. Pool vs. Burwell Goodwyn and Stephen P. Pool; said sale took place in the county of Brunswick, Virginia, on the 6th day of June, 1829, at the residence of Burwell Goodwyn, and at his request; to the best of his recollection and belief, the negro woman and her child, were purchased by Skepeth M. Oliver; the negroes were present

at the sale, and I do not recollect that I made any formal delivery of them; said execution was fully satisfied, and there was no complaint from any of the parties.

To the *Cross-Interrogatories*, he answers: That Skepeth M. Oliver was the highest bidder and the negroes, Winey and her child Caroline, were knocked off to him; he, the said Oliver, satisfied the execution; whether he paid his own money or that of another person, I do not know; as witness before stated, his return on said execution shows that it was satisfied by Oliver and witness; knew no other person in said transaction; said negroes were in the possession of Burwell Goodwyn at the time of levying the execution, and in witness's possession until they were sold at the time and place before stated, and he has no recollection about any reasons being given about delivery of possession; the sale was conducted as Sheriff's sales usually are, and when the purchase money was paid. Witness further states, that a true copy of the execution, in the case of Etheriel Crowder, (identical with that contained in the record, with the entries thereon introduced in evidence by defendant,) assignee of Stephen P. Pool vs. Burwell Goodwyn and S. P. Pool, which witness states is a part of his deposition, is a true and perfect copy, and that the entries are true and perfect.

Defendant next introduced the testimony of *Skepeth M. Oliver*, taken by commission. Witness answered, that he was well acquainted with Col. Burwell Goodwyn and his wife, Nancy Goodwin, and the family; that he purchased two negroes, viz: Winey and Caroline, at Sheriff's sale, on the plantation of said Burwell Goodwyn, in Brunswick county, Virginia; said sale was conducted by Sheriff Gill in May, 1829, as well as witness recollects; he, witness, purchased said negroes for said Burwell Goodwyn, at his request, and he paid the purchase money to the Sheriff; witness bid off the negroes, Winey and Caroline, and did not take any bill of sale for them, nor did he deed them, or in any way convey them to any person but Col. Burwell

Goodwyn; settled with the Sheriff for them and took possession of them. Witness states further, that his father was unwell and sent him up to buy the negroes in for said Burwell Goodwyn.

*Answers to Cross-Interrogatories:* Witness means by purchase, that he bought the negroes, Winey and Caroline, in for the said Burwell Goodwyn, at his request; that he paid no money for them; but Col. Burwell Goodwyn paid for them the sum of three hundred dollars; he was at that time in possession of sundry property. Witness further states, that his father was unwell and sent him, and that he bought in said negroes, Winey and Caroline, for said Burwell Goodwyn, at his request, and he saw him pay the money; witness never deeded or gave any bill of sale for said negroes, from the fact that he purchased them at the request of Burwell Goodwyn, and he paid the purchase money and took the negroes into possession. The reason that he, witness, did not make any bill of sale or deed to the property, was, that he bought them at the request of Burwell Goodwyn, and for him the said property was levied on to satisfy an execution in favor of E. Crowder, assignee of Stephen P. Pool, who was present at the sale.

*Thomas D. Goodwin*, examined as witness for defendant; witness states as follows: That he was the son of the defendant, was born in 1813; was three years older than plaintiff; knew Winey and Caroline; Winey nursed him, and was always in possession of Burwell Goodwyn, his father; from his first recollection till his said father's death; was present at said Sheriff's sale; Winey and Caroline were sold at said Sheriff's sale by Wm. M. Gill, deputy Sheriff, on the plantation of Burwell Goodwyn, in Brunswick county, Virginia; said sale was public; Skepeth M. Oliver was present and bid off said negroes at said Sheriff's sale. Burwell Goodwyn sent for Oliver. Negroes went back into Burwell Goodwyn's possession, and remained in his possession till he died on February 14th, 1835; were never in the possession of

Mrs. Elizabeth Goodwyn since witness's recollection. Said Sheriff's sale took place in 1829; never knew of the said negroes being sold at other Sheriff's sale; the negroes, after Burwell Goodwyn's death, went into defendant's possession, and have remained in her possession ever since. Defendant moved from Virginia to Georgia in 1843, and brought negroes along. Soon after Burwell Goodwyn's death plaintiff claimed the negroes. Defendant denied his right to said negroes. Plaintiff procured a copy of grand-mother's will, and claimed the negroes under said will. Defendant observed to plaintiff that his father's money paid for said negroes, and plaintiff did not deny it; also, told plaintiff that the negroes belonged as much to other children as to him; that in 1843, in Georgia, plaintiff proposed to hire the negroes to defendant for $200 00, then on her refusal to hire them, offered to take $50 00, and finally offered to take five dollars, when defendant told him she would not hire her own negroes; that when plaintiff came back from Tennessee, in 1847, plaintiff and Braddock Goodwyn spoke, in presence of defendant and family and witness, of renting land and farming together. Plaintiff was asked where he was going to get negroes to work his land, he replied that he was going to take these negroes, that they were his. Defendant then told him that he had no negroes. These negroes were never in plaintiff's possession or controlled by him. Witness stated to Davis Owen, in 1845, when he wished to buy one of said negroes, that his mother could not sell the negro, as she was claimed by plaintiff; he did not tell said Owen that said negro belonged to plaintiff, who was then up the country. Mrs. Elizabeth Goodwyn died in October, 1830. Witness's father died in debt; no administration was taken out on his estate, because of the old claims outstanding against him; that plaintiff lived with Burwell Goodwyn till his death, then with defendant till he went back to Virginia. Plaintiff did not return till about Christmas, 1846; went to Virginia on his mother's business. Witness could not state

whether he had sworn, on a former trial, that Elizabeth Good-
wyn had purchased said negroes.

*John W. Powell* was next sworn for defendant, and
stated, that he had a conversation with plaintiff, in 1848 or
1849, in relation to said negroes now in dispute; that in said
conversation he, witness, charged upon the plaintiff, that he
knew that his grand-mother willed the negroes to him to
shelter·them from his father's debts, and for the benefit of
his father and his family or his father and children, which ·
he, plaintiff, admitted was so; that he knew nothing of a
compromise or treaty pending before the conversation with
plaintiff and his said admission. That he, witness, had no
authority, from any one, to make a compromise, and knew
of no effort to compromise; that he was a brother-in-law of
plaintiff. The said conversation was in relation to the
negroes in dispute. Plaintiff offered to sell witness his
grocery in Newnan, which cost one thousand dollars, and
his interest or claim in the negroes in dispute, for $1,500.
Witness offered to give it if he, plaintiff, could make a good
title to the property, to which plaintiff made no reply; that
the negroes. were 'then worth from three to four thousand
dollars. Witness approached plaintiff with the view of
bringing about a compromise, and to prevent a suit. Wit-
ness was son-in-law of defendant. That his wife was dead.
Parties afterwards agreed to a compromise, but it was after-
wards broken off.

*Braddock Goodwyn,* sworn for defendant, says: That he
heard plaintiff offer to hire the negroes, in dispute, to defen-
dant in the year 1843, and that he came down as low as
five dollars, and she refused to give it, saying to plaintiff .that
she would not hire her own negroes; and again, in 1847,
he, witness and plaintiff, were about to go to farming to-
gether, and that plaintiff was asked where he was going to
get negroes to work on said farm; plaintiff replied that he
would take the negroes in dispute, that they were his; de-
fendant replied that he would do no such thing; that he,

plaintiff, had no negroes; defendant was all the while in possession of said negroes, exercising acts of ownership over them. In 1848 or 1849, plaintiff requested defendant to let him have Ned to wait on him, and defendant permitted plaintiff to take Ned for this purpose; and some eight or ten months afterwards defendant instructed witness to bring Ned home again, and that he, witness, went to plaintiff and got Ned and returned him to defendant; plaintiff was present when he took Ned for the purpose of taking him back to defendant, and made no objection. Witness also stated that plaintiff remarked that he would quit the case if his lawyers would let him; they had paid out money for him, and would not let him quit.

*Henry C. Goodwyn*, sworn for defendant, says: That in the year 1843, plaintiff was about leaving for the State of Virginia, and proposed to hire the negroes, in dispute, as low down as five dollars, and defendant refused, stating that they were her negroes; also, that in the year '51 or '52, plaintiff stated that he would abandon his case, but that his lawyers had paid out money for him, and would not let him do it. Witness also proved value of property and hire, &c., and that defendant had been in possession of said negroes ever since he could remember.

*Tax-Book.*—Defendant here introduced the tax-book, from which it appeared that plaintiff gave in no negroes.

Here the defendant closed.

In rebuttal by plaintiff—*Davis Owen*, sworn, says that in 1845, he informed Thomas D. Goodwyn that he would give eight hundred dollars in gold for negro girl Caroline, and that Goodwyn replied that she could not be sold, that she belonged to plaintiff, who was, at that time, at or near Nashville, Tennessee.

The parties having closed, the Court charged the jury as follows:

The plaintiff, in this action, deduces title to the negroes in controversy from Elizabeth Goodwyn's will, and the re-

covery is resisted, on the ground that the title to Winey and Caroline was never in the testatrix, and this is the issue to be determined from the evidence. If you should believe, from the evidence, that Elizabeth Goodwyn, at the time that she made her will, and at her death, had the title to the negroes in dispute, then she could convey that title to the plaintiff by her will, and the jury ought to find a verdict for the plaintiff. On the other hand, if you should believe, from the evidence, that Mrs. Elizabeth Goodwyn, at the time of her death, had no title to these negroes, then she could convey none, and you ought to find a verdict for defendant. Verbal admissions should be received with great caution by the jury, and may be explained and avoided; when they are made by a party in ignorance of his rights, the law will not hold them binding. The mere verbal admissions or declarations of the defendant, that these negroes were the property of the plaintiff, will not, in law, invest the plaintiff with the title to the property, so as to enable him to recover in this action without other evidence of title thereto on his part. If Mrs. Goodwyn continued to retain the possession of the property and exercise the control and dominion over it as the owner of such property—if the negroes were the property of Burwell Goodwyn, at the time of his death, then they constituted a part of his estate after his death; and the declarations and admissions of defendant could not divest the estate of title to the negroes; it follows, of course, that such declarations and admissions cannot invest title in plaintiff. If the jury should believe, from the evidence, that these negroes were the property of Burwell Goodwyn before and at the time of Sheriff's sale; and, if you further believe, from the evidence, that at the Sheriff's sale that they were purchased by Elizabeth Goodwyn, and that the purchase money was paid by her, then the title to the property vested in her. On the other hand, if the jury should believe that said negroes were purchased, at said sale, by Burwell Goodwyn or some one else for him, and that his money paid for

them, and he retained the possession of them until his death, then they were his property and belonged to his estate. The question is, if there was a sale, who paid the purchase money? and, in deciding this question, you ought to give the most credit to those witnesses who had the best opportunities of knowing the facts about which they testified. If Burwell Goodwyn wrote Elizabeth Goodwyn's will, or acquiesced in its provisions, that circumstance would not invest her with title to the property, nor would such a result be produced by any verbal declaration or admission made by him to the effect that the property was hers. It is also true, that the verbal declarations or admissions of Burwell Goodwyn, or of the defendant, that the property is or was plaintiff's, could not invest plaintiff with the title thereto. After all that any of the parties may have said, the question should be decided according to the real truth of the case, and the question recurs, who paid the money at said Sheriff's sale? and whose money was it? When a party pays money the law presumes that it was his own money, but it may be proved by circumstances, who paid the money.

The jury found for the plaintiff the negroes in dispute and the hire; whereupon, counsel for defendant moved the Court for a new trial, on the following grounds, to-wit:

1st. That the said verdict is contrary to law and the charge of the Court.

2d. That the verdict is contrary to the evidence.

3d. That the verdict is unsupported by the evidence.

4th. That the verdict is contrary to the decided weight and preponderance of the evidence; which motion the Court overruled and passed the following order:

Although the Court does not feel satisfied with the verdict in this case, yet it does not believe it is so decidedly against the weight of evidence, and the jury being satisfied with it, the Court will not disturb it.

Whereupon the counsel for the said defendant, excepted to said decision overruling said motion for a new trial.

SAMUEL FREEMAN; and ROBERT W. SIMMS, for plaintiff in error.

BUCHANAN, *contra.*

*By the Court.*—STEPHENS J. delivering the opinion.

The sole question presented to us is, whether this verdict is supported by the evidence, and this question is still further narrowed down to the single point—whose money paid for the negroes in controversy? If the money of Mrs. Elizabeth Goodwyn paid for them, then they were her property, and Napoleon was entitled to recover them under her will. If her money did not pay for them, she had no title, and he, claiming only through her, had no better, and was not entitled to recover them. Upon this point the evidence is conflicting, preponderating perhaps against the verdict, but not sufficiently so to authorize us to overrule the jury, especially as the presiding Judge who heard the witnesses, and saw the whole trial refused to disturb the verdict. The occasion on which Mrs. Elizabeth Goodwyn bought these negroes, if at all, was a Sheriff's sale in Virginia. The defendant in trover, Mrs. Nancy Goodwyn, introduces the testimony of the persons connected with that sale. The Sheriff testifies (and so is his return on the execution) that the negroes were bid off and paid for by one Oliver, while Oliver testifies that he bid them off, but that *Burwell Goodwyn* paid for them and took them. This is the substance of the whole case as made by Nancy Goodwyn. It is of importance to remark that it conflicts with itself. But how does it stand with the evidence produced by Napoleon? He proved by a great number of witnesses, that Nancy Goodwyn had constantly said through a long series of years, that the negroes were *his.* She was his mother; she was the widow of Burwell, and had doubtless derived her knowledge of the facts from her husband, who knew all about it. Her opportunities, therefore,

for knowing the truth were ample, better perhaps than those of any other living person. We think she can scarcely complain that the jury found, she had through that long series of years, been speaking truth, and not falsehood.

Judgment affirmed.